Good morning to this honorable court and good morning to counsel. My name is David Schoenberger. I'm here representing Mary Lou Stelter in a disability discrimination claim against WPS. Ms. Stelter was disciplined and then terminated in 2014 because she continued to need disability-related medical care and treatment and because her disability progressed in the course of that year, all of which was an annoyance to her supervisor, Wendy Harrings. This case involves evidence of pretext as well as direct and circumstantial evidence of a pretext held by Ms. Harrings against Ms. Stelter due to her disability. Now it also involves factual interpretations and conclusions reached by the district court where it construed the evidence in the light most favorable to the defendant, not the plaintiff. And it involves some evidence that does not exist in the record on which the district court relied in reaching some of its conclusions. So the first thing I want to talk about is some evidence in pretext and that involves Harrings' testimony about information she obtained from third parties to support her termination recommendation. The district court claimed that, well, Harrings really couldn't remember details about what she was said or when she was told these things. That is not correct. She volunteered very specific information about questions she asked of these third parties, information they gave her about Stelter's job performance and when they testimony is. Let's actually look at it. Pages 170 to 177 of her deposition is important. I'm asking her about her termination decision. I'm asking her about who is measuring her performance. That isn't true, Ms. Harrings, it was only you. In response on 170 she says, it was my recommendation but I did it in talking to other people in the company. Well we know Roger Green, Roger Ebert didn't have any input on Stelter's job performance. He first came to WPS in September of 2014 and he testified unequivocally. I was just relying on what Harrings told me. I didn't have any information about Stelter's job performance other than what she said. Green testified similarly. I relied entirely on Ms. Harrings. So I asked her in her deposition, well who else did you talk to in the company? She says, I talked to underwriting to get their opinion about whether she was grasping the concepts. I talked to Rick Riggs and Frances Friend who trained her during the performance improvement plan time period and I talked to an agent, Sarah Neitzel. Okay, so now she's identified those four people. I asked, who did you talk to in underwriting? She says, Bob Bearbrick. So I asked her on 171, what did Bob tell you? Three different times in the past. She said, Bob said Stelter did not know large group. One time on 173 she says, Bob said she clearly did not understand large group. And then move on to Rick Riggs. I say, well what did Rick Riggs tell you? Before you get too deeper into the factual weeds here, all of this strikes me as not evidence of pretext. In other words, that she lied about her reasons for recommending termination. That's what pretext is. This strikes me as evidence that maybe she made an error of judgment in determining that your client wasn't performing well or maybe she was wrong about that, not that she lied about it. Well here's why it's significant in my opinion, Judge. I asked her in her deposition, well give me some examples where you say she was deficient in her job performance in large group work. Large group being Bob Bearbrick, the sales logic system, the proposal system, and an outside agent who sells large group product. So I understand where you're saying as far as the reasons for termination. What's wrong with relying on other people in the organization for an assessment about whether she was qualified? Absolutely nothing. But when you flat out lie about talking to those people because they all refuted her testimony completely, when you flat out lie about it, that's the problem because now she's making up reasons to try to cover up the fact she didn't have any basis to say she was deficient in large group work. And let's be honest, if the shoe was on the other foot, if these four people in the company had actually testified that yes, I did tell her she didn't understand large group work or she didn't understand the proposals or she didn't understand the sales logic system or she didn't know her job duties, we lose that case. We lose that case every time. But now the shoe's on the other foot, it's just the opposite. So certainly that tells me we should at least be able to survive summary judgment on that issue. So I do believe it is evidence of pretext because it goes to the very reason, actually the number one reason, Herring's gave for terminating Stelter's employment, that she didn't understand large group work. That was the number one reason she gave and she's telling everyone. Mr. Schoenberger, Mr. Schoenberger, forgive me, and I don't mean to shout, but I have, you know, it's harder. Are you able to point to any document in the record where Ms. Stelter expressly asked for an accommodation or specified a work expectation that she was unable to Yeah, there is, there was a request that she get a stand-up desk, one of those desks that raise up so she couldn't stand and sit and alternate. She didn't actually get that, but Judge, accommodation is not an issue in this case because both parties concede she got all the accommodations she needed and then it was no hardship to accommodate Ms. Stelter. And so, in fact, we didn't even raise that issue in the Court of Appeals of any failure to Well, is there outside objective evidence beyond her own assertions about what major life activities were limited by her back condition? Well, of course, her doctor talks about major life activities that she's impacted. She's doing a desk job, first of all, so we got to understand that this is a sedentary job and so you can have lots of disabilities that are recognized under the ADA as actual disabilities that don't preclude you from doing a desk job. That's why Congress It's like being a judge in the Court of Appeals. What's that? It's like being a judge in the Court of Appeals. Exactly. And so, I mean, that's what Congress was trying to get us to is that, look, it's not just looking at, well, can I think, can I read, can I concentrate, can I do those types of things. They also said you have to look at the major bodily functions and in this case you're looking at the musculoskeletal system and the neurologic system. Her lumbar spine was severely compromised. There was degeneration at multiple levels and significantly so to the extent that she had an extruded disc that was impinging on a nerve which was really causing her severe pain and that's what the problem was in 2014. Did she ever formally request additional time away from work to attend to doctor's appointments related to her back injury? She didn't because she said that's what she was going to be doing is getting this medical care and treatment and as I've said, the defendant fully concedes that, yeah, she could have any accommodation she wanted. It was no hardship. And one other question that I wondered about because you claimed in your brief that her job duties did not really change after the reorganization. Did she, in fact, have to deal much more after the reorganization or not? It is our position that she did not, Your Honor, and we have testimony from WPS's own employees conceding that her job duties didn't change. She still had to deal with individual work products and she still had to deal with Medicare and what happens is she's at the office so she gets calls from all these agents asking questions about individual product, Medicare, all these things. She still had to handle all those questions. There's no question that Wendy Harring's job duties focused more on large group but as far as Mary Lou Stelter, she still had to deal with all those things. Thank you. Thank you, Judge. So now I just want to circle back and talk about this testimony because here's the problem. She's saying that, she's lying, she's saying I'm talking to these individuals, I'm soliciting opinions from them and they're telling me that she doesn't know what she's doing. She doesn't know her job duties and she needs training and these are WPS personnel. If anyone was going to support her, you would think they would have come and said, yeah, geez, I did say that. Yeah, she did need training. She didn't understand her job. They didn't say anything like that. In fact, Greg said he had no complaints about Stelter job performance and never said she needed training. A friend, he never even talked to Harring's about Stelter and, in fact, he didn't even know who Stelter was. Bob Bearbrook, very importantly, said he didn't recall any negative input he gave to Harring's about Stelter and he never concluded Stelter did not know her job. Sarah Neitzel said she was always outstanding, outstanding in everything she ever did for me. She was very helpful and what I would say is these are deliberate falsehoods on a major issue in the case, that issue being her large group work performance and, in my summary judgment. There's other issues as far as large group performance. The defendant claims in prior reviews, the prior reviews are evidence of long-standing job performance deficiencies. The district court accepted that as truth. Here's the problem. There isn't one review, not one, that says she had a large group performance deficiencies before her disability became an issue. In fact, they don't say anything like that and the 2013 review makes five separate comments about what a great job she's doing on large group work. That was the review right before the June 14 review and so there's nothing that indicates that at all. It's not consistent with the facts and what happened is there was a change, a morphing of the evidence, changing it from, at the end of the reviews, as you probably know, most reviews have future learning objectives, future learning opportunities, and these were identified as she could have some future learning opportunities. The WPS changed that to say those learning opportunities are present performance deficiencies. That is not accurate and that's what the district court relied on in coming up with its decision. In the 13 review, there's five comments, I'm only going to talk about one. It says, Stelter was under pressure, this is hearings own comments now, Stelter was under pressure to turn around a number of large group proposals in a short time and did a good job meeting the deadlines and  This was signed in August of 13, this is 10 months before the June 14 review. That not only cast doubt on her saying she doesn't have, she can't do large group, but it also cast doubt on Haring's testimony in 14 that suddenly Mary Lou didn't know what needed to be included in large group proposals. Clearly she did. Now also in the defendant's brief on page 36 and 37 they alert this court to fact they say, well in April of 13 is when the focus for Haring's became large group work. Think about that for a second. April of 13 to June of 14, that's 14 months. We don't have a note, we don't have a meeting, we don't have a letter, we don't have a warning, we don't have a threat of suspension or termination, nothing but radio silence for 14 months. The only thing that happened in that 14 months is in August she got this review saying you do great work on large group. The fact is there was no large group work deficiencies. So now I do want to talk just briefly about the second and third reasons that were given is this notice of absence issue thing and what was lost on the district court is Haring said Stelter wasn't giving her 24 hours notice of these doctor appointments. Here's the problem. She came up with that after she talked to Lacy Green, the HR person, in October saying hey I want to terminate Stelter. So they're having some discussion and they come up with this 24-hour issue. This issue goes back to 2010. Well but not 24-hour notice judge. If you look at the reviews, what the reviews... Well that's hair-splitting. The issue of her repeated absences without advance notice started occurring in June of 2010. But they was happening. What the reviews talk about is when she was taking the appointments. Haring's wanted her to take any appointments over her lunch hour. What Stelter was doing was coming in either early or staying late or working over her... I got to answer this question though. The reviews never one time, not one review mentions an issue with notice of absences. So I'll save the minute I have left for rebuttal. Thank you. Mr. Harvey. Good morning, your honors, and may it please the court. In order to succeed on the two discrimination claims that the plaintiff is still pursuing at this point, she needed to prove three elements. One, that she was disabled within the meaning of that she was qualified to do the job that her employer was asking her to do. And three, that she was terminated or let go because of that disability. She couldn't prove her burden on any of those three elements, let alone all three. She couldn't prove she was disabled because by the time she was let go in December 2013, her own doctor had released her nearly eight months earlier to return to work with no restrictions. So after April 2014, when she comes in with a doctor's note that says she's fine to go back to work, she then gives subsequent notes to WPS from her own doctor again saying she's got no restrictions, she's fine to go back to work. So by the time December 2014 comes around, she's not disabled within the meaning of the ADA. So she can't carry a burden on the first element. She also can't carry a burden on the second element. Well, before you leave that topic, is it a prerequisite to a finding of disability that a doctor has issued restrictions? It's not a usually it's the employer's doctor coming in and saying that individual's not disabled. Here her own doctor came in and said, no, she's fine to go back to work. Right, that's just a statement about whether she needs restrictions or not. It's not an opinion about disability under the statute. Well, I'd say two things in response to that. One, Ms. Stelter didn't think she was disabled either because what did she do when she got that note from her doctor in 2014? She could have said the doctor's name was Dr. Stark. She could have said, Dr. Stark, I don't agree with what you're saying. I don't feel like I'm healed. She didn't have to give that note to WPS. She could have gone and got a second opinion, a third opinion, and WPS wouldn't have known anything about it. Instead, she got the note from her doctor saying you're fine. She looked at it, she read the note, and then she came in to WPS and said I'm fine to go. Secondly, the only case that they cite on this issue is the Powers decision, and the Powers decision is actually an easier case than this one, or a more difficult case than this one, because in Powers, the plaintiff was a truck driver and part of his job was driving truck, and the other part involved unloading and loading at the dock, and he could do that before the injury. After the injury, he comes in and says I can still drive the truck, but I can't unload and unload the dock, the more physical activity. In that case, this court affirmed summary judgment in the employer's favor and said that's not a disability under the ADA, because even though you can't do all of the same functions that you're performing for, you can still do the core functions, which is driving the truck. And this case is easier than that one because there's no dispute that Ms. Stelter was able to perform her desk job before the injury and after the injury. So they have no case law that supports the theory that they're throwing out there, and in fact the only case they cited supports WPS. You know, Ms. Herring's assertion that she talked to all those other people in the company, like Fairbrook, Riggs, Frances Friend, before deciding to terminate her, isn't that problematic in light of testimony from each of those people? I recall having any problems with Stelter. That alone could establish that Ms. Herring's stated reasons for terminating Ms. Stetler were protectual, couldn't it? No, for two reasons. One, that was not a material part of her decision, and she was very clear about that in her deposition. Plaintiff's counsel kept trying to... I mean, yes, that's what she said. You know, you've got to put that up against what they said. Well, her testimony was very clear. I didn't even talk to these folks about her termination. She said, I've been working with these people, or had interactions with them over the years, and I have these general recollections. And her recollection was correct in some of those incidents, and in particular Bob Fairbrook's testimony, which I believe is on the record at page... record 46, pages 23 through 25, 37, 41, 43 through 48, 55 through 58, 63 through 69, 73 through 75, 78 and 79, and 81 and 83. If you read those pages... Boy, you knew this question would be asked. Yeah, well, what he said was, I don't remember that specific conversation that Ms. Herring's is talking about, but if you read all of those pages, he said, part of my job, because he was the head of underwriting, I don't think that was his actual title, but he basically ran the underwriting department, and he said, because of that, I had frequent interactions with Ms. Stelter and the others in her position throughout the other offices, because part of what Ms. Stelter's job was, to interact with the customers or the prospective customers, gather their application, send it to underwriting, but her job was to make sure everything was in order so underwriting could crunch their numbers and figure out what the rate was going to be. And he said, so I interacted with her and all the other individuals, emails, certainly on a daily basis, phone calls or whatever, at least once every two weeks, and he was asked, do you remember Ms. Stelter, because she was just one of many, and he said, yes, I do remember Ms. Stelter, and this is four years later, and he was asked, well, why do you remember, and his answer was, quote, constant coaching. He was asked to elaborate, and he said, processes and procedures, she couldn't get them down. I had to keep reminding her over and over. She would send us a packet of stuff, and we'd say, Ms. Stelter, you gave us X, Y, and Z, what we need is A, B, C, and one of the examples he gave was particularly telling. She said, or he said, one of her jobs, if it was a large group proposal, they had to send in or fill out a medical questionnaire. It was kind of detailed, you know, how many employees do you have, what's the spend, what's the nature of, things that underwriters want to know about, and Ms. Stelter's job was to look over that questionnaire and make sure that it was filled out completely accurately, and then send it to underwriting, and he said we would have to send him back to her, and I remember this specifically with her because I kept having to repeat the same problems over, or the same explanations over and over, both me and my staff, because my staff would bring it up to me, and Exhibit 1 to his deposition is a perfect example of that because it comes up in the context of October 2014, so well past the performance, hey, you got to step up your game, Ms. Stelter. October 2014, she's asking him questions that were very basic that he felt she should have been able to answer, and he testified about Exhibit 1, and he said, this is one example, I can remember eight other specific email examples, but I certainly gave information to Ms. Harrings or Ms. Harrings' supervisor because I wouldn't have shown up on a review because I wasn't a supervisor, but I was dealing with these people on a weekly basis, and if they were gumming up the works in my underwriting department, that's a point of Ms. Harrings' attention because she was a problem when it came to this. To address a couple of other points that opposing counsel brought up, he said there's no other examples of deficiencies. There are, and the records replete with them. One that Ms. Harrings talked about was she didn't understand large group rates and how they compared to competitors, and one of the things she alluded to this email chain and its opinions that I can't really figure out why she's being asked to send out a rate in this one instance, but in this other instance, she's being admonished for it, and Ms. Harrings explained there's two reasons for that. One, I told her specifically, you're not allowed to send out rates unless you run them by me so I can make sure they look right, and she didn't in the second instance, but two, more importantly, if she knew what she was doing with large group and understood our rates, she would have never sent that quote out because it made us look bad. In that instance, I said we're not competitive with our competitor, and yet Ms. Stelter sends this out late 2014 proving either she doesn't understand the rates like she should or she was too lazy to go look them up, and either one is a problem for Ms. Harrings, and a legitimate problem. She also didn't even understand which agents were selling large group. There's the discussion about her going, they're at the end of the performance plan, nothing's working, so Ms. Harrings says you know what, we're in a sales role here, why don't you go visit some agents in our sales here, and so she drives two hours to Wausau and she makes three visits. Two of the visits are to agents that don't even sell large group, and that's important because, and this addresses another issue that counsel raised, there was a fundamental shift and it wasn't just an informal shift, it was a formal shift. As of May 2014, Ms. Harrings had, in April 2014, in theory, Ms. Harrings had four products, small group, individual, large group, and as of May, formally, she lost all of her small group and all her individuals. They said we're handing it to a totally separate agent, you're not touching that Ms. Harrings, which meant Ms. Stelter shouldn't be touching it either, and so months later she goes and takes visits to people that we're not even supposed to be working with anymore. That shows that she doesn't know what she's doing, these are fundamental aspects of her job that she just did not understand. The absence issues that was discussed ad nauseum, going back to Your Honor's right, it was 2010. She either was unwilling or unable to comply with the policy and would continually take off without providing the notice and put a hardship on the rest of the small office because everyone had to cover for her, and one of the co-workers talked about it in her deposition testimony too. Why did Ms. Harrings block Ms. Stelter from putting her appointments onto Ms. Harrings complaint that she needed more notice of Stelter's appointments? It wasn't, I don't think it was just, I think it was an office-wide, one of the witnesses, I think it was Nicole Cooper, although it may have been one of the other ones, it was an office-wide calendar that everyone had access to to put your appointments on there, but that same witness said yeah that calendar was out there until 2014 and then it went away, but she said I don't even remember Mary Lou, I'm sorry, Ms. Stelter ever putting her appointments on there, and she said there was another calendar by the door, it's kind of a sign in sign out sheet where you were supposed to also put your appointments, and the same witness said Ms. Stelter, she was taking a long weekend, she put that on there, but she never put her medical appointments on there, so I don't think it was an instance where she was actually, there's no evidence that she ever put a medical appointment on that electronic calendar, but even if she did, if that's something that she really did, why wasn't that her response in every one of the reviews? Why wouldn't she say Ms. Harrings, what are you talking about? I put these electronic She never said that because she didn't, but even if she would have, it wouldn't have addressed the fact that she wasn't providing sufficient notice. It does no good to put something on a calendar 20 minutes before you leave because Ms. Harrings is saying this is a small office, I need 24-hour notice so I can provide coverage for everyone, and it also wouldn't have addressed the fact that she scheduled all of her appointments for, you know, three o'clock in the afternoon so she's got to leave early and then she doesn't come back, as opposed to take them over lunch and then just miss a little time instead of basically an afternoon. But there's no evidence that she ever put those appointments on the calendar. Counsel said that again there was no change. I talked a minute ago about the formal change. That's in the record. There was a formal change and her large group and self-funded was all Ms. Harrings was doing. So if Ms. Stelter didn't understand that her job was supposed to change, that just proves WPS's point. There was a formal edict from WPS that she's not, that Ms. Harrings is not supposed to be touching anything but large group and self-funded after that point. But the also undisputed evidence is that Ms. Harrings said as an informal matter in mid-2013, all of my time started going, shifting towards large group, and that's probably why WPS made the formal announcement in May 2014 that we're gonna we're gonna be specialized in that. You've already been going there anyways. But that goes back to mid-2013 and again, if Ms. Stelter didn't realize that, that shows why there was a problem. I believe the other arguments were addressed in our briefing if the court has no further questions. We're asking that the court affirm. All right, thank you. I just want to go through the last issue that was addressed by counsel Ms. May in the reorg. It is not accurate that Ms. Harrings was only doing large group during the reorg. That is not true. She was doing small group. Small group did not go away. She was doing small group and large group and still selling ancillary products. Regardless, WPS concedes Stelter's job duties didn't change. She still had to answer agent questions on individual products and Medicare products. Now I want to circle back to this October email cited by counsel. Stelter did send an email on October 14 to Bob Fairbrook. But why she sent it was because Harrings was telling Stelter to submit small group proposals to large group underwriting, which is not proper. And Stelter knew it wasn't proper. So she was contacting Fairbrook from large group to say, hey she keeps telling me to sell these send these groups under 50 to large group but they got to go to small group. All Fairbrook was doing was verifying to case. The last thing I want to talk about is the transcript. There's a transcript issue here that's in the brief that all the evidence that defendant relies upon is part of evidence that wasn't in front of the district court when it made a summary judgment decision. It can't be considered. Thank you. All right. Thank you. Thanks to both counsel. The case is taken under advisement and we'll move to our